

SEALED

CASE UNSEALED
11/6/13 KCM

FILED

13 NOV -1 PM 4:12

BY_____ do _____

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: |
| Plaintiff, | **COMPLAINT**    13MJ4027 |
| v. | |
| LEONARD GLENN FRANCIS (1), and JOSE LUIS SANCHEZ (2), | Title 18, U.S.C., Sec. 371 – Conspiracy to Commit Bribery |
| Defendants. | |

The undersigned complainant being duly sworn states:

Beginning no later than on or about January 2009, and continuing up to September 2013, defendants LEONARD GLENN FRANCIS and JOSE LUIS SANCHEZ, and others, did knowingly and unlawfully conspire to commit bribery, in violation of Title 18, United States Code, Section 201(b)(1)(C), with such offense begun or committed outside any particular district; all in violation of Title 18, U.S. Code, Section 371.

The complainant states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

James McWhirter, Special Agent, DCIS

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE, THIS _1_ DAY OF NOVEMBER, 2013

The Honorable Bernard G. Skomal
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, James McWhirter, being duly sworn, hereby depose and state as follows:

### AFFIANT

1.      I am a Special Agent with the Department of Defense, Office of Inspector General, Defense Criminal Investigative Service ("DCIS"), Long Beach Resident Agency. I have been so employed since May 2009. Prior to my employment with DCIS, I was a special agent with the U.S Postal Service Office of Inspector General for approximately two years and prior to that a special agent with the U.S. Army Criminal Investigation Command for approximately 10 years. In addition to my law enforcement experience, I was employed for approximately 9 years as an auditor for the Defense Contract Audit Agency. I have received specialized training in the investigation of various financial and white collar crimes and I have personally conducted or assisted in the investigation of violations of U.S. law to include bribery, kickbacks, public corruption, conspiracy, theft, money laundering, conflicts of interest, mail fraud and anti-trust violations. I have prepared numerous affidavits to support the establishment of probable cause for search and arrest warrants. I am familiar with the facts set forth below based upon my own investigative findings and conversations with other participating law enforcement agents.

### INTRODUCTION

2.      In conjunction with the United States Department of Justice ("DOJ"), the Naval Criminal Investigative Service ("NCIS"), the Defense Contract Audit Agency ("DCAA"), and colleagues from DCIS, I have been investigating, among other allegations, fraud and bribery allegations involving LEONARD GLENN FRANCIS ("FRANCIS") and his company, Glenn Defense Marine (Asia) ("GDMA"), which acts as a general contractor to the United States Navy.

As part of this investigation, agents are examining whether FRANCIS and GDMA committed fraudulent practices in the performance and billing of GDMA's contract to perform services to the U.S. Navy; whether things of value were improperly given to various U.S. Navy and other government personnel by FRANCIS and GDMA; and whether FRANCIS, GDMA, U.S. Navy and other government personnel have obstructed justice.

3.      Based on the facts as set forth below in this affidavit, I respectfully submit that there is probable cause to believe that FRANCIS, a Malaysian citizen who lives in Singapore, and United States Navy Commander JOSE LUIS SANCHEZ ("SANCHEZ"), have conspired to commit bribery, in violation of 18 U.S.C. § 371. Specifically, as set forth below, there is probable cause to believe that to promote and protect GDMA's business, FRANCIS agreed with SANCHEZ to make, and facilitate the making of the payment of things of value, including travel expenses, entertainment, and prostitutes, to SANCHEZ in return for him violating his official and lawful duties by transmitting classified information to a person not entitled to receive it, and making unauthorized disclosures of proprietary, internal U.S. Navy information, and to influence SANCHEZ in the performance of his official acts, including recommending where U.S. Navy ships came to port and where government personnel should be assigned.

4.      As defined by 18 U.S.C. § 3238, this offense was begun and committed on the High Seas and otherwise out of the jurisdiction of any particular district, and thus, venue is proper for this offense in the Southern District of California, as the District in which one or more joint offenders, namely FRANCIS, will be arrested in connection with this offense.

5.      This affidavit is intended to demonstrate that there is probable cause to charge FRANCIS and SANCHEZ and does not set forth all of my knowledge about this matter. The

2

facts set forth in this affidavit are based upon my training and experience as well as my, and members of the investigations', personal observations; review of documents; interviews of witnesses; and review of physical evidence obtained during the course of this investigation. The documents obtained and reviewed include documents from the U.S. Navy submitted by or pertaining to GDMA; emails and email account information from U.S.-based email service providers, specifically including email accounts issued to FRANCIS, SANCHEZ, and other persons associated with the matters under investigation; information from U.S.-based credit reports, bank account and credit card information; internal GDMA documents and emails; and telephone records.

## BACKGROUND

6.    The U.S. Navy is a branch of the U.S. Department of Defense, whose mission is to maintain, train, and equip combat-ready naval forces capable of winning wars, deterring aggression, and maintaining freedom of the seas. The U.S. Navy Naval Supply Systems Command ("NAVSUP") is a command within the U.S. Navy, which is responsible for the global supply and delivery of goods and services to U.S. Navy personnel and warfighting assets. The U.S. Navy Fleet Logistics Commands ("FLC") are subordinate commands of NAVSUP located in various domestic and foreign locations and they provide logistics support for all naval installations and vessels operating in each location's area of responsibility. In particular, the NAVSUP FLCs are responsible for the soliciting, awarding, and overseeing contracts awarded to entities for goods and services required by the U.S. Navy in each specific FLC's area of responsibility. NAVSUP FLC in Yokosuka, Japan ("FLC Yokosuka") supports naval installations and vessels operating in Japan, Hong Kong, South Korea, and Russia. FLC

3

Yokosuka also oversees the operations of a Detachment in Singapore ("FLC Singapore"), which supports naval installations and vessels in foreign countries, including Singapore, Indonesia, the Philippines, Thailand, Cambodia, Vietnam, Australia, and elsewhere.

7.      GDMA is a multi-national corporation with headquarters in Singapore and operating locations in other countries, including Japan, Singapore, Thailand, Malaysia, Korea, India, Hong Kong, Indonesia, Australia, Philippines, Sri Lanka, and the United States. GDMA is owned and controlled by Leonard FRANCIS, who is the Chief Executive Officer/President of GDMA, and who oversees the daily business and operations of the company. FRANCIS is assisted by a core management team, consisting of persons known to the investigation and identified here by initials: HP, Vice President Worldwide Contracts; NP, Vice President Global Operations; and AW, General Manager Global Government Contracts. GDMA also employs Country Managers for each of its operating locations in foreign countries.

8.      GDMA is a commercial and government contractor whose main business involves the "husbanding" of marine vessels, and as such, GDMA is known as a "husbanding service provider" ("HSP"). "Husbanding" involves the coordinating, scheduling, and direct and indirect procurement of items and services required by ships and submarines when they arrive at port. Examples of items and services required by ships and submarines when in port include tugboats, fenders, port authority/custom fees, security, provisions (food), fuel, water, trash removal, collection holding and transfer of liquid waste ("CHT"), transportation, and many others.

9.      Many of these items and services are supplied by lower tier subcontractors; however, GDMA does own a vast array of assets, including tug boats; water, trash, and CHT

4

barges; docking equipment; small vessels for patrol (i.e. picket boats); passenger shuttles; security barriers; and other miscellaneous equipment it uses to fulfill husbanding requirements.

10.    GDMA has been husbanding vessels for the U.S. Navy for over 25 years. In or about June 2011, NAVSUP awarded GDMA three regional contracts to provide husbanding services to U.S. ships and submarines at ports throughout Southeast Asia (Region 2), Australia and the Pacific Isles (Region 3), and East Asia (Region 4). The Region 4 contract is managed by FLC Yokosuka, and the Region 2 and Region 3 contracts are managed by FLC Singapore. These contracts involve substantial sums of money. By way of example, the Region 2 contract was structured as a first year base value of $25 million, which the U.S. Navy could opt to extend for up to four additional years, for a total base value of $125 million. Within each region, certain ports are more lucrative to GDMA than others. According to GDMA correspondence which I have reviewed, FRANCIS and GDMA employees referred to these ports as "Pearl Ports."

11.    JOSE LUIS SANCHEZ is a Commander in the U.S. Navy who has been stationed at U.S. Central Command in Tampa, Florida, since about April 30, 2013. From about May 2012 until his April 2013 transfer, SANCHEZ served as the Executive Officer for the Commanding Officer at FLC Yokosuka. In that position, SANCHEZ was involved in all the operational and administrative efforts performed by personnel within FLC Yokosuka and FLC Singapore. From about July 2010 until about May 2012, SANCHEZ was the Director of Operations for FLC Singapore, where he was responsible for operational and administrative efforts regarding ship movements and other operations. From about April 2008 to April 2010, SANCHEZ was the Deputy Logistics Officer for the Commander of the U.S. Navy Seventh Fleet ("C7F") in Yokosuka, Japan. The Seventh Fleet's area of operations encompasses more than 48 million

5

square miles, from the Kuril Islands in the north to the Antarctic in the south, and from the

International Date Line to the 68th meridian east, which runs down from the India-Pakistan

border. As Deputy Logistics Officer, SANCHEZ was responsible for assuring that all Seventh

Fleet ships received the supplies and services needed to maintain readiness. From about late

2006 to about April 2008, SANCHEZ was a contracting officer with the U.S. Navy Air

Command, responsible for procuring goods and services required for several U.S. Navy aviation

programs. SANCHEZ began his career as a Naval Officer in about 2002, as a Supply Officer

aboard U.S. Navy ships in the Seventh Fleet. In that capacity, SANCHEZ was responsible for

coordinating with husbanding service providers to assure that the ship scheduled and received all

requested supplies and services while the ship visited a foreign port. At all times relevant to this

affidavit, SANCHEZ was a public official within the meaning of 18 U.S.C. § 201(a). It was a

violation of SANCHEZ's official and lawful duties to: (a) transmit information that the Navy

had classified as "Confidential" or "Secret" to any person not entitled to receive it; and (b) make

unauthorized disclosure of proprietary, internal U.S. Navy information.

12.    A person known to the investigation, identified here as "EA," is a U.S. citizen

currently living in San Diego, CA. EA served as an Officer in the U.S. Navy with his last

assignment in 2007 as the Force Protection Officer for the USS Blue Ridge, the flagship for C7F.

In 2009, EA was hired by GDMA to be the General Manager for Japan, where he worked until

January 2012. As the GDMA Japan General Manger, EA had responsibility over the GDMA

husbanding services in Japanese ports, including Tokyo, Hakata, and Osaka.

//

//

6

## **PROBABLE CAUSE TO BELIEVE THAT A CRIME HAS BEEN COMMITTED**

13.    Starting when SANCHEZ was the Deputy Logistics Officer for the Commander

of the U.S. Navy Seventh Fleet in Yokosuka, Japan, until he transferred to Florida in April 2013,

FRANCIS gave SANCHEZ a total of over $100,000 in cash, as well as travel expenses and

prostitutes, in exchange for SANCHEZ providing FRANCIS with internal U.S. Navy

information, some of which was classified, and for official acts, as set forth below.

14.    FRANCIS is the subscriber for the email account

"Leonard.Glenn.Francis@gmail.com," and SANCHEZ is the subscriber for the accounts

"jose.sanchez@fe.navy.mil," jsanchez_90@hotmail.com, and navy94@cooltoad.com."

FRANCIS often used the initials "LK," an abbreviation for "Lion King," to sign his emails, and

SANCHEZ often signed his emails using the initial "J," an abbreviation for Jose.  SANCHEZ

also addressed FRANCIS as "Lion King" and "Boss" in emails.

15.    SANCHEZ created a Facebook account in the name of Troy Smith which he used

almost exclusively to communicate with FRANCIS.  As set forth below, SANCHEZ regularly

sent information that the Navy had classified, and proprietary, internal U.S. Navy information to

FRANCIS, usually by forwarding the information from SANCHEZ's government email to one

of his private email accounts or to Facebook, and from there sending the information on to

FRANCIS.

16.    From January 2009 through October 2009, SANCHEZ provided FRANCIS with

classified and/or U.S. Navy proprietary internal information about U.S. Navy ship schedules, and

husbanding issues that could affect GDMA, in violation of SANCHEZ's official and lawful

duties, as follows:

     a.  On January 15 and 16, 2009, SANCHEZ sent FRANCIS emails including those entitled "UPDATES 1 of 3" and "UPDATES 3 of 3." FRANCIS forwarded these to GDMA Vice President NP, with their scanned attachments listing ship schedules and upcoming port visits. The attachments to UPDATES 3 of 3 were marked "SECRET," referring to their official classification by the Navy. UPDATES 1 of 3 included ship movements and schedules for "replenishment at sea," marked and classified as "C//REL AUS" (meaning classified as "Confidential," but releasable to Australia).

     b.  On January 17, 2009, SANCHEZ sent FRANCIS a scanned copy of a schedule for Navy submarines marked "SECRET//NOFORN" (meaning classified as "Secret," not releasable to foreign nationals).

     c.  On September 14, 2009, SANCHEZ sent FRANCIS a message on Facebook enclosing a copy of ship schedules, classified as "Confidential."

     d.  On September 16, 2009, SANCHEZ sent FRANCIS a message on Facebook enclosing a copy of ship schedules, classified as "Confidential."

     e.  On October 6, 2009, SANCHEZ sent FRANCIS a message on Facebook enclosing a copy of ship schedules, classified as "Confidential."

     f.  On October 16, 2009, SANCHEZ sent FRANCIS two Facebook messages alerting him about U.S. Navy concerns about $111,000 in GDMA charges for force protection for a U.S. Navy ship visit to Port Klang, Malaysia, one of the "Pearl Ports" for GDMA. The second email from SANCHEZ concluded: "Will call tonight to discuss."

17.    Also on October 16, 2009, SANCHEZ and FRANCIS discussed the number of rooms needed for the "wolf pack," consisting of SANCHEZ and other U.S. Navy personnel, for a visit to Kuala Lumpur and Singapore evidently scheduled for later that month. SANCHEZ also

asked for pictures for "motivation." FRANCIS replied: "J, got it we will hook up after the FLAG dinner, will arrange a nest for you guys and some birds [women]." On October 19, 2009, SANCHEZ sent a Facebook message to FRANCIS saying "Yummy . . . daddy like." In an October 23, 2009 Facebook message, SANCHEZ asked FRANCIS "Where r we staying in KL [Kuala Lumpur]? No pictures to get our spirits up?" Based on other emails and similar patterns of conduct, I have reason to believe that FRANCIS was paying for rooms for U.S. Navy officers including SANCHEZ at upscale hotels in Kuala Lumpur and Singapore, together with the services of female escorts.

18.     From June 2010 through March 2011, SANCHEZ provided FRANCIS with classified and/or U.S. Navy proprietary internal information about U.S. Navy ship schedules, and husbanding issues that could affect GDMA, in violation of SANCHEZ's official and lawful duties, as follows:

a.   In a June 13, 2010, email, SANCHEZ provided FRANCIS with the dates and locations of port visits by the USS Blue Ridge in July and August 2010. The USS Blue Ridge is the Command and Control vessel for the Seventh Fleet, and accordingly where senior officers for the Seventh Fleet reside when at sea.

b.   In an email of September 4, 2010, SANCHEZ sent FRANCIS internal Navy emails from the Director of FLC Yokosuka, discussing husbanding costs associated with a visit by an aircraft carrier to Port Klang, Malaysia, and the Navy's efforts to lower the charges. SANCHEZ also asked FRANCIS how they could meet in Singapore the following day.

c.   In November 2010, emails show SANCHEZ sending FRANCIS internal Navy emails discussing cost-containment strategies for an upcoming port visit to Manila. Internal GDMA emails then show FRANCIS and his staff devising their counter-strategies. In other

9

emails, FRANCIS asked SANCHEZ to keep sending him updates, particularly on the status of

the extension of the tour of duty for the Director of FLC Yokosuka, and the latest ship schedules

for replenishment at sea. In response, SANCHEZ promised to provide further details. He also

forwarded to FRANCIS an email that the Director, FLC Yokosuka had sent to the State

Department asking for State Department assistance with the port authority in Manila for an

upcoming ship visit which was not covered by GDMA's contract.

     d. On February 5, 2011, in an email chain between SANCHEZ and FRANCIS,

SANCHEZ sent FRANCIS a recent ship scheduling change, and also provided him with detailed

comments and talking points for FRANCIS to raise in an upcoming meeting with an Admiral

about port visits costs and the U.S. Navy's cost savings initiatives.

     e. On February 12, 2011, SANCHEZ sent FRANCIS an email advising him that

SANCHEZ would be available to meet FRANCIS in person in Japan, and sending him "the

king's update." Attached to this email was an internal email from the Commander of FLC

Yokosuka to an Admiral, and other senior officers, in which the Commander detailed activities

and concerns for the preceding week and the upcoming week. Several issues involved costs

under husbanding contracts, including port tariffs, items which the Navy emails referred to as

"gold plated" items, fuel, and details of the then-pending husbanding contract. According to

records I have reviewed, GDMA was subsequently awarded that contract.

     f. In early March 2011, an issue arose with regard to the impending visit of the

USS Blue Ridge to Port Klang, Malaysia. The Navy understood that the ship could not dock

unless it promised up front to pay the port tariff charges which GDMA asserted were due to Port

Klang Cruise Terminal, the port authority. According to other documents obtained in the

investigation, FRANCIS is the majority stockholder in Glenn Marine Group, which owns Port

Klang Cruise Terminal. In March 2011, SANCHEZ provided FRANCIS with emails containing internal Navy discussions, including legal opinions, among FLC Yokosuka and FLC Singapore personnel on what actions to take on the port tariffs issue. In an email to FRANCIS, SANCHEZ also provided advice on how to handle the situation with FLC.

19.     At this time, between March 3 and 11, 2011, FRANCIS was emailing with a woman in Indonesia whom he used to provide female escorts. This email asked the woman to set up "girls" to come to Singapore on March 14-16, 2011, for SANCHEZ, another Navy Commander, and two other men. One of the emails described one of the "girls" as "Alda 167 cm [height], 36b [bra size], very young n still study, 17 yr." However, according to an email FRANCIS sent to the woman on March 10, 2011: "All Cancel sorry Japan Tsunami so Jose and friends not coming."

20.     On March 21, 2011, SANCHEZ deposited $13,000 in cash into his account at Navy Federal Credit Union. Our investigation has not been able to locate a legitimate source for this cash.

21.     Later that month, on or about March 29, 2011, FRANCIS sent SANCHEZ an email containing a picture of one of the girls identified in Paragraph 19 of this affidavit, along with the statement, "I miss you BABE:)." SANCHEZ replied to FRANCIS the same day, "Nice pictures......Brings back good memories:)."

22.     Between March 30, 2011 and May 26, 2011, SANCHEZ provided FRANCIS with classified and U.S. Navy proprietary internal information about U.S. Navy ship schedules, and husbanding issues that could affect GDMA, in violation of SANCHEZ's official and lawful duties, as follows:

11

a. On April 11, 2011 SANCHEZ sent an email to FRANCIS that contained the identities of U.S. Navy ships and scheduled port visits for each ship during the months of April, May, and June, 2011, saying "apologize for the delay" and offering "more to follow as I see updates." At the time, this information was classified as "Confidential." On April 12, 2011, FRANCIS sent an email to SANCHEZ, thanking him for the updates, asking for additional Commander summaries, and seeking inside information from two named FLC Yokosuka contracting officials who were then involved in the award of a regional husbanding contract (later awarded to GDMA).

b. On May 21, 2011 SANCHEZ sent an email to FRANCIS that contained internal FLC Yokosuka email correspondence and a document identifying the costs that a competing husbanding contractor charged the U.S. Navy for husbanding services associated with a ship's visit to Manila, Philippines.

c. On May 23, 2011 SANCHEZ sent four emails to FRANCIS that contained 22 pages showing the identities of U.S. Navy ships by type and each ship's scheduled port visits during the months of June, July, and August, 2011. At the time, these materials were classified as "Confidential." One of these attachments included information about ships of the United Kingdom, Netherlands, and France. On the same day, FRANCIS sent an email response to SANCHEZ: "Thanks, got it all..."

23.     On May 26, 2011, while SANCHEZ and his family were in Hong Kong, SANCHEZ sent an email to FRANCIS stating, "Just in case you don't have it, my Blackberry number is 08013857325. No one showed up this morning, so we are headed out to lunch. Thanks again sir." Within an hour, SANCHEZ sent another email to FRANCIS stating, "Belay my last sir...just received a call and he is on his way." SANCHEZ then sent FRANCIS two other

12

emails, one stating "THANKS AGAIN SIR" and the second stating "Thanks again sir...I'm completely humbled by everything...your man just left. Time to enjoy the great food of Hong Kong...wish you were here. . . ." In the last email in the string, FRANCIS responded SANCHEZ: "My pleasure, brudda." We have developed evidence that FRANCIS used couriers to provide cash and things of value to Navy officials, however, we do not know what SANCHEZ received that prompted these expressions of gratitude.

24.     On July 21, 2011, FRANCIS sent an email again to the woman in Indonesia, asking her to arrange girls for SANCHEZ in Singapore and Jakarta: "Hi Sayg on the 23rd Jose is in Singapore for 5 days then to Jkt 27th to 30th. Can you arrange [name] and some girls for him in Jakarta and Singapore...." On July 21, 2011, the woman responded to FRANCIS, asking how many girls for how many days in each location, and for how many people.

25.     Between August 26 and 28, 2011, FRANCIS communicated through email to the email address of an escort whom FRANCIS hired for SANCHEZ (referred to here as "JA"). On August 26, 2011, FRANCIS sent an email to JA stating, "Hey Love Jose is in Manila at the DIAMOND Hotel go and see him he needs some love asap room  - Diamond hotel - phone number 632-[xxx-xxxx] - room number 2402 - Blackberry #  81-[xxxxxxxxxx]." JA responded to FRANCIS, "Papi, I'm here jose's fon is not an[]swering. I'm here [h]aving dri[n]ks at the lobby. Call him:: (( maybe his sleeping?" Later that day, JA emailed FRANCIS, "I'm with h[i]m already heehhe." On August 28, 2011, FRANCIS emailed JA again asking, "Hey so did you see Jose on the 2nd day?" The next day, JA responded to FRANCIS: "Goodmorning papi. Hi. First day I saw him 2nd day i I waited in fron[t] of the hotel for 2hrs and no jose ((("

26.     Between September 28 and December 2011, SANCHEZ provided FRANCIS with classified and/or U.S. Navy proprietary internal information about U.S. Navy ship schedules, and

husbanding issues that could affect GDMA, in violation of SANCHEZ's official and lawful duties, as follows:

   a. On September 28, 2011, SANCHEZ sent an email to FRANCIS that contained internal discussions among U.S. Navy personnel about the high cost for tug boat services that GDMA charged U.S. Navy ships visiting Sepangar and Singapore, and steps the U.S. Navy could take to reduce these costs.

   b. On October 1, 2011, SANCHEZ sent an email to FRANCIS that contained an internal FLC Yokosuka email and a Microsoft PowerPoint briefing about port tariff costs at Port Klang, and a perceived conflict of interest between GDMA and the Port Klang Cruise Terminal, which is controlled by FRANCIS.

   c. On October 20, 2011, in reference to a port visit in Laem Chabang, Thailand, FRANCIS sent an email to SANCHEZ asking him to "swing it our way" concerning an issue about the U.S. Navy's use of "sea cards" to buy fuel. The U.S. Navy can use "sea cards" to purchase fuel for its ships at a price negotiated by the Defense Logistics Agency for Energy, as opposed to procuring fuel at usually higher prices from the husbanding contractor, or the local economy. On October 21, 2011, SANCHEZ replied, "Ask and you shall receive...we worked this out this morning. . . ." In October 2011, the USS Mustin did in fact conduct a port visit to Laem Chabang. During the port visit, the USS Mustin bought fuel from GDMA, not "sea cards." As a result, the USS Mustin paid over $1M for fuel, more than twice what the fuel would have cost through use of the "sea card."

   d. On October 20, 2011, FRANCIS also asked SANCHEZ to find out if FLC management had met about GDMA's force protection invoices for Thailand. FRANCIS followed that direction and reported back to FRANCIS.

e.   From November 10 to 12, 2011, FRANCIS received from SANCHEZ internal Navy communications about CHT charges and service, asked for SANCHEZ to help GDMA, and received advice from SANCHEZ.  For GDMA, continuous CHT is much more lucrative than scheduled CHT pickup.  On November 10, 2011, FRANCIS emailed SANCHEZ about a "Smart ass SSO [ship supply officer on the USS Curtis Wilbur]" causing problems regarding CHT service, and asking "when are you going to weigh in and fix this nonsense."  The following day, SANCHEZ sent an email to FRANCIS, advising him specifically on how to address CHT issues with the Navy after two recent mishaps, and to demonstrate the need for continuous CHT service.

f.   On November 14, 2011, SANCHEZ emailed FRANCIS about the Director of FLC Yokosuka, SANCHEZ's supervisor, trying to verify recent GDMA invoices for Thai picket boats.  SANCHEZ reported that the Director had said that if she could not obtain verification from the company that supposedly provided the picket boats, she intended to have NCIS investigate possible fraud.  "Just wanted to give you a head's up on another potential investigation."  In fact, these were incidental charges for which GDMA was supplying phony invoices and overbilling the Navy.

g.   On December 3, 2011, SANCHEZ emailed FRANCIS that an agent in Yokosuka had updated a Navy Commander to the effect that the agent was making progress on the open investigation in Japan.  He concluded:  "Is there anything else you need?  When are you actually going to be in town?"

h.   On December 3, 2011 FRANCIS replied to SANCHEZ stating, "With NCIS there are two investigations one is Meble [GDMA's Country Manager for Japan] and his mess in Japan which we could defend a disgruntled sub con[tractor] who is stirring shit and same for

15

Thailand the RTN [Royal Thai Navy] Fraud case which both are hard to prove and charge. I have

inside Intel from NCIS and read all the reports. I will show you a copy of a Classified Command

File on me from NCIS ha ha."

    27.    Between March and May 2012, SANCHEZ provided FRANCIS with classified

and/or U.S. Navy proprietary internal information about U.S. Navy ship schedules, and

husbanding issues that could affect GDMA, in violation of SANCHEZ's official and lawful

duties, as follows:

    a.  On March 29, 2012, SANCHEZ sent FRANCIS an internal Navy email chain

in which FLC Yokosuka (including SANCHEZ) discussed how best to handle the CHT charges

for ships, and exchanged drafts of language for ships to use in their requests to GDMA for CHT

handling. SANCHEZ introduced his email to "LK" with: "Here is the expected language that

we plan on telling ships to submit in their LOGREQs." A LOGREQ is used to order

husbanding services. SANCHEZ forwarded this string of emails three times before FRANCIS

confirmed receipt.

    b.  On April 29, 2012, SANCHEZ forwarded to FRANCIS internal Navy

information about the upcoming solicitation of a husbanding contract for Southeast Asia, telling

FRANCIS: "LK, This is good, you guys can probably make a better profit here...."

    28.    On May 8, 2012, FRANCIS sent SANCHEZ an email containing a hotel

reservation confirmation at the Shangri-La Hotel in Singapore for the period May 14 to 19, 2012.

On May 9, 2012, SANCHEZ emailed FRANCIS his reply, stating, "Sir, Thank you very much...I

am always humbled by your generosity." On May 9, 2012 FRANCIS sent SANCHEZ an email

stating, "Cheers Bro, Flight details for pick up." According to the reservation, the room at the

Shangri La Hotel was guaranteed with an American Express card ending in X-5002. FRANCIS has an American Express card ending in X-5002.

29.     Between July 9, 2012 and July 11, 2012, FRANCIS and SANCHEZ exchanged emails regarding airline reservations for immediate travel to the United States. The emails show that SANCHEZ had delayed getting these tickets, and now the prices were very high. SANCHEZ asked FRANCIS ("Boss") for help, and FRANCIS arranged and paid for this travel, totaling over $13,000. FRANCIS then sent SANCHEZ an email containing an airline flight confirmation for SANCHEZ and his daughter, and stating, "Bro I will issue the following tickets we are too late for this evenings flight confirm asap." On July 11, 2012, SANCHEZ sent FRANCIS an email stating, "[F]light is fine, sorry for the delay."

30.     Between July 9 and July 12, 2012, SANCHEZ provided FRANCIS with classified and/or U.S. Navy proprietary internal information about U.S. Navy ship schedules, and husbanding issues that could affect GDMA, in violation of SANCHEZ's official and lawful duties, as follows:

       a.   On July 10, 2012, FRANCIS emailed his management group about another issue regarding a ship's purchase of fuel through sea cards, saying: "We need th[e] Fuel Intel from Yoko[Yokosuka]! Then we know how to reply! If we reply now it will b on th radar!" Later that day, SANCHEZ sent FRANCIS a draft of an internal U.S. Navy briefing by a U.S. Navy Commander, intended for NAVSUP and FLC, on strategies to recoup debts owed by contractors for overcharging on husbanding contracts. That briefing focused on CHT charges and procedures, and the Online Pricing Application, which are issues that form part of this investigation.

17

b.  On July 10 or 11, 2012, SANCHEZ sent FRANCIS internal Navy emails discussing allegations of fraud by GDMA being referred to the NCIS.

c.  On July 12, 2012, SANCHEZ sent FRANCIS an email stating, "Looks like contracts is requesting to extend everyone.  We will hold a board once I get back off leave.  I will try my best and move people out.  Currently at airport...thanks again sir."  According to documents I have reviewed and based on my training and experience, I understand that the email concerned extending the tour of duty of five people, including the Director of FLC Yokosuka. FRANCIS viewed these persons, including the Director, as unfavorable to GDMA.  SANCHEZ attached to this July 12, 2012, email the internal U.S. Navy extension requests submitted for three of the employees in question, as well as an internal email chain discussing these extensions. FRANCIS forwarded SANCHEZ's email to his top management, calling these extensions "BAD NEWS," but noting:  "Jose sits on the Board and will try to sway the decision."  FRANCIS then asked his GDMA Vice President HP, who had been a U.S. Navy officer, to provide his ideas on "how can we influence behind the scene."  HP responded later that day with several paragraphs of suggestions and information, and suggesting that FRANCIS send the comments to SANCHEZ, saying "Anything else is up to Jose."

31.  After the July plane tickets, SANCHEZ provided FRANCIS with classified and/or U.S. Navy proprietary internal information about U.S. Navy ship schedules, and husbanding issues that could affect GDMA, in violation of SANCHEZ's official and lawful duties, as follows:

a.  On August 2, 2012, SANCHEZ sent FRANCIS an email discussing complaints against GDMA by the U.S. Consulate General in Japan regarding GDMA's lack of coordination with the Hakata, Japan port authority.

18

b.  Also on August 2, 2012, SANCHEZ sent several emails to FRANCIS containing internal FLC emails, one of which contained the new FLC Commanding Officer's agenda with respect to husbanding service contracts, and another of which included internal instructions to U.S. Navy officials that ships should be more judicious in regards to the costs of husbanding services.

32.    On January 28, 2013, SANCHEZ's wife deposited $10,000 in cash into their account at the Navy Federal Credit Union.  The origin of this cash is not known to the investigation.

33.    On February 3, 2013, SANCHEZ emailed FRANCIS his thoughts about a draft letter FRANCIS planned to send to the U.S. Naval Attache in Malaysia, arguing against reducing port visits to Malaysia by U.S. Navy ships due to high husbanding costs.

//

//

//

//

//

//

//

//

//

//

//

//

## CONCLUSION

34.     Based on the foregoing, I respectfully submit that there is probable cause to

believe that, from at least January 2009 through February 2013, LEONARD GLENN FRANCIS

and United States Navy Commander JOSE LUIS SANCHEZ have engaged in a bribery

conspiracy in violation of 18 U.S.C. § 371, by agreeing that FRANCIS would make, and

facilitate the making of the payment of things of value, including travel expenses, entertainment,

and prostitutes, to SANCHEZ in return for him violating his official and lawful duties by

transmitting classified information to a person not entitled to receive it, and making unauthorized

disclosures of proprietary, internal U.S. Navy information, and to influence SANCHEZ in the

performance of his official duties, including recommending where U.S. Navy ships came to port

and where government personnel should be assigned.  I therefore request that the Court issue

arrest warrants for FRANCIS and SANCHEZ.  I further request that the complaint, affidavit, and

warrants be placed under seal until further Order of the Court.

Respectfully submitted,

James McWhirter
Special Agent
Defense Criminal Investigative Service

Subscribed and sworn to before me on _____ Nov 1 _____, 2013.

The Honorable Bernard G. Skomal
UNITED STATES MAGISTRATE JUDGE